Edward E. ELLIS, Appellant,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellee.

No. S–7255.

Supreme Court of Alaska.

Sept. 26, 1997.

Edward E. Ellis, Trapper Creek, pro se.

Lawrence Z. Ostrovsky, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Edward Ellis, a mineral prospector, challenged the validity of a Department of Natural Resources (DNR) Mineral Closing Order (MCO), claiming that the MCO violated the Alaska Constitution and the statutes governing the closure of state lands to mineral entry. The superior court granted DNR's motion for summary judgment. Ellis appeals. Because DNR acted within its constitutional and statutory authority when it issued the MCO, and because the MCO has a reasonable basis in the agency record, we affirm.

## II. FACTS AND PROCEEDINGS

Ellis first began mining for gold and other minerals in the Yentna basin in 1973. After making some discoveries along Lake Creek in the Matanuska–Susitna (Mat–Su) Valley, Ellis established a "fulltime prospecting program" there in 1983. He invested substantial time and money in furthering his discoveries by doing such things as constructing trails, camps, and helicopter pads. He and his wife raised six children on their mining claims.

On August 7, 1985, DNR issued MCO 455, which closed to new mineral entry approximately 320,000 acres of state land in the Susitna and Willow subbasins in the Mat–Su Borough, including the area where Ellis was prospecting near Lake Creek. The land was closed subject to valid existing rights.

MCO 455 was issued pursuant to AS 38.05.185(a), which provides that state land may be closed to mining or mineral location if the commissioner of DNR "makes a finding that mining would be incompatible with significant surface uses on the state land." AS 38.05.185(a). Ellis asserted that as a result of MCO 455, he was unable to proceed on many prior discoveries around Lake Creek that he had staked, but not filed. After 1985 he continued to develop the claims he had filed.

Between 1986 and 1994 Ellis made numerous requests of DNR to perform a mineral assessment in the Lake Creek area; he formally petitioned DNR to reopen to mineral leasing a small portion of the area covered by MCO 455. DNR denied these requests.

In 1994 Ellis filed a complaint in superior court challenging MCO 455 and claiming that the State illegally closed state lands, thereby depriving him of his "constitutionally protected mining interests, property and rights." The court granted DNR's motion for summary judgment. Ellis appeals.

## III. DISCUSSION

### A. Standard of Review

The standard of review for an appeal from summary judgment is *de novo*. *Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995). We "will uphold a summary judgment only if the record presents no genuine issues of material fact and 'the moving party was entitled to judgment on the law applicable to the established facts.'" *Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994) (citation omitted).

We must determine from the administrative record whether there was a reasonable basis for MCO 455. *Kelly v. Zamarello,* 486 P.2d 906, 917 (Alaska 1971). A reviewing court applies the "reasonable basis" test when reviewing administrative decisions involving complex issues that require agency expertise. *Id.* Under the "reasonable basis" standard of review, we give deference to the agency's determination "so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion." *Kodiak W. Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc.,* 592 P.2d 1200, 1203 n. 7 (Alaska 1979). We exercise "independent judgment" when determining whether an agency complied with procedural requirements. *Moore v. State,* 553 P.2d 8, 33 (Alaska 1976).

B. *Does DNR's Administrative Record Reflect a Reasonable Basis for MCO 455?*

■ Ellis has not raised any genuine issues of material fact that would justify reversal of the superior court's summary judgment for DNR. Instead, he challenges the adequacy and reasonableness of DNR's decision to close the Lake Creek area to new mineral entry. Ellis's action is essentially an appeal of an administrative decision.[1] Thus the court's inquiry is limited to a review of the administrative record which was before the Board when it made its decision. *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 169 n. 7 (Alaska 1974).[2]

Ellis argues that DNR acted arbitrarily and capriciously in issuing MCO 455. He is particularly troubled by the finding that the Lake Creek corridor has a low mineral value.[3] He also challenges the reasonableness of DNR's decision to leave the area open to oil and gas leasing.

DNR based the closure on the recommendation contained in a land use plan, the Susitna Area Plan (SAP), which was developed in accordance with AS 38.04.065. The SAP was the product of a three-year study by an interagency planning team that worked in conjunction with the U.S. Department of Agriculture to prepare "reports describing resource values and identifying existing and potential land uses throughout the planning area." The planning team included, among others, representatives from various divisions of DNR, the Department of Fish and Game, the Department of Transportation and Public Facilities and the Mat–Su Borough.

In entering MCO 455, the DNR commissioner found that certain stream systems in the area and their adjacent riparian uplands were "used extensively by the public for fishing, floating, boating, transportation to hunting, and public access corridors." The commissioner also found that the salmon and other fish populations in these river systems not only supported substantial sport fishing, but were also major contributors to the Upper Cook Inlet commercial salmon fishery.[4]

The commissioner concluded that these activities constituted "significant surface uses" of state land under AS 38.05.185(a),[5] and that mining was incompatible with these significant uses and thus threatened an important segment of the economy of the Susitna basin.[6] The commissioner considered the mineral potential of the area, and found that "existing information indicates that the areas proposed for closure to mineral entry have low mineral value."[7] The SAP notes, howev-

---

1. We have held that "[h]owever denominated, a claim is functionally an administrative appeal if it requires the court to consider the propriety of an agency determination." *Haynes v. State, Commercial Fisheries Entry Comm'n*, 746 P.2d 892, 893 (Alaska 1987).

2. For this reason, we reject Ellis's arguments that he was entitled to additional discovery and a trial and that he should be allowed to supplement the administrative record with expert testimony at a trial. *See Interior Paint Co. v. Rodgers*, 522 P.2d 164, 169 n. 7 (Alaska 1974) (judicial review of administrative agency decisions should be limited to the record before the agency).

3. Basing his assessment on his own sample tests, Ellis concludes that the mineral value of the land in the Lake Creek drainage exceeds $213,000,-000.

4. The commissioner, in issuing MCO 455, found that in 1982 more than 76,000 user days (and almost $11 million) were spent sport fishing on these river systems. The Upper Cook Inlet commercial salmon fishery was valued at $21.8 million annually from 1977–82.

5. AS 38.05.185(a) (1984) provided in part:

   State land may not be closed to mining or mineral location unless the commissioner makes a finding that mining would be incompatible with significant surface uses on the state land.

   This statute has since been amended. Ch. 52, § 1, SLA 1993.

6. AS 38.05.185(a) provides that DNR may not issue an MCO unless it is in compliance with a land use plan developed under AS 38.05.300. Ellis argues that the commissioner failed to follow the proper procedures when DNR issued MCO 455. DNR correctly points out that the SAP "is both consistent with and specifically referenced and incorporated in MCO 455."

7. Ellis had ample opportunity to communicate his assessment of the mineral value of the area to the drafters of the SAP during more than forty public meetings held throughout the Susitna basin as the SAP was being developed.

er, that there is "some potential for future oil and gas development."

■ We conclude that the agency's determination was reasonable and supported by the evidence in the record. *See Kodiak W. Alaska Airlines,* 592 P.2d at 1203 n. 7.

### C. *Did DNR Provide Adequate Notice to the Public before Issuing MCO 455?*

DNR gave notice of proposed MCO 455 during June 1985; it issued the order on August 7, 1985. Ellis asserts that the notice was not sufficient for prospectors, many of whom spend summers in the field.[8]

■ Assuming that the actual dates of publication of proposed agency action may affect whether potentially affected persons see the notice, the legal adequacy of notice nonetheless depends on whether statutory requirements are satisfied. DNR fulfilled the statutory mandate of AS 38.05.945 by providing notice by publication in a newspaper of statewide circulation and a newspaper of general circulation in the vicinity at least thirty days before the proposed action. AS 38.05.945(b). DNR was also required to provide notice by one or more of the following methods:

(1) publication through public service announcements on the electronic media serving the area affected by the action,

(2) posting in a conspicuous location in the vicinity of the action,

(3) notification of parties known or likely to be affected by the action, or

(4) another method calculated to reach affected persons....

AS 38.05.945(b)(1)–(4).

DNR placed an advertisement in the Mat–Su Valley's newspaper, the *Frontiersman,* on June 15 and 19, 1985, announcing the proposed closing and the affected areas. It also placed an advertisement in the *Anchorage Daily News* on June 15 and 16, 1985. In addition, DNR sent notices in June to the Alaska Miners Association, the manager of the Mat–Su Borough, and the Talkeetna Postmaster, among others. The record re-

flects that DNR provided sufficient notice by newspaper, and also provided notice according to, at the very least, subsections (b)(2) and (b)(3).

■ To the extent that Ellis's argument implies that even statutory notice did not meet due process standards where MCO 455 affected miners in the field when notice was given, we do not find that the statutory notice requirements were unreasonable or inadequate. There was no showing that even miners in the field would, as a class, not receive notice. There is no indication DNR selected a publication date with any intention to limit the efficacy of notice.

### D. *Did MCO 455 Deprive Ellis of Any Property Rights?*

Ellis claims that the minerals contained within his staked claims, and the improvements he made on state land—such as the pack trails he built along Lake Creek—are interests or rights in property that are protected by the Alaska and federal constitutions.

As DNR correctly points out, MCO 455 specifically exempts valid existing claims. The order states that it is "subject to valid existing rights." The superior court noted that if Ellis "truly has valid existing claims, MCO 455 does not bar him from developing them." We consequently reject his arguments that he was denied due process and that he is entitled to a trial at which he may offer evidence of his property rights. The issue whether Ellis has valid preexisting claims was not before the lower court, and is not an issue in this appeal.

■ Ellis's contention that discovery alone gives rise to compensable property rights is without merit. "A person acquires the exclusive right to possess and extract minerals on state land by discovery, location, and recording." *Welcome v. Jennings,* 780 P.2d 1039, 1042 (Alaska 1989); AS 38.05.195. Absent discovery, location, and recording, no

---

**8.** In his articulate and well-presented *pro se* oral argument, Ellis explained that he did not learn of

the land closure until the fall of 1985, when he left his prospecting site and went to Anchorage.

property rights exist to the minerals within an unperfected claim.[9]

### E. Did MCO 455 Violate the Alaska Constitution or the Statutes Governing Closure of Land to Mineral Entry?

Ellis argues that MCO 455 violates the resource development policy and public interest provisions contained in article VIII, sections 1, 11, and 16 of the Alaska Constitution.[10] Ellis also argues that MCO 455 violates AS 38.05.185, AS 38.05.300 and AS 44.99.110.[11] The superior court did not err in holding that the record supported the commissioner's determination that MCO 455 furthers the public interest, and that the order was therefore consistent with the Alaska Constitution.

Ellis argues that the commissioner exceeded her statutory authority in issuing MCO 455. Alaska Statute 38.05.185 authorizes the commissioner to close state land to mining upon a finding that "mining would be incompatible with significant surface uses on the state land." AS 38.05.185(a). In addition, the commissioner must follow the procedures outlined in AS 38.05.300 before she may close state land to mining. *Id.*

When DNR issued MCO 455 in 1985, AS 38.05.300 provided:

(a) The commissioner shall classify for surface use land in areas considered necessary and proper.... State land, water, or land and water area may not, except by act of the state legislature, be closed to *multi-*

*ple purpose use* if the area involved contains more than 640 acres.

(Emphasis added.) "Multiple use" is defined in part as:

the management of state land and its various resource values[,] ... making the most judicious use of the land *for some or all of these resources* ...; it includes

(A) *the use of some land for less than all of the resources....*

AS 38.04.910(4)(emphasis added); *see* AS 38.05.965(11).

MCO 455 closed more than 640 acres, but only to mineral entry and not to multiple use. The land covered by MCO 455 could still be used for its other resources; it therefore remained open to multiple use.

Ellis incorrectly relies on AS 38.05.300(a) as it read following amendment in 1993. The 1993 amendments significantly restrict DNR's authority to preclude mining or mineral entry or to designate mining or mineral entry to be incompatible uses, when the area of land to be closed exceeds 640 acres. AS 38.05.300(a), *as amended by* Ch. 52, §§ 2, 3, SLA 1993. Unless one of the exceptions applies, an area exceeding 640 acres no longer may be closed to mineral entry except by act of the legislature. *Id.* These amendments were not in effect in 1985, and do not apply retrospectively. AS 01.10.090.

No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law.

---

9. DNR informed Ellis that he may have discovery rights protected by 11 Alaska Administrative Code (AAC) 86.105 and 11 AAC 86.135 in the mineral deposits he discovered along Lake Creek corridor.

10. Article VIII, section 1 of the Alaska Constitution states:

It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.

Article VIII, section 11 of the Alaska Constitution provides, *inter alia*, that "[p]rior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals."

Article VIII, section 16 of the Alaska Constitution provides:

11. AS 44.99.110(1) declares state mineral policy and announces the general principle that the State must promote a sound economy through appropriate conservation and development of the State's mineral resources. That statute does not expressly provide for retrospective application, and was not enacted until 1988, three years after DNR issued MCO 455. The statute cannot be applied retroactively. *See* AS 01.10.090. Even if AS 44.99.110(1) were applicable, MCO 455 is not inconsistent with the general principle it declared.

## IV. CONCLUSION

Because issuance of MCO 455 was within DNR's constitutional and statutory authority as it existed when the order was signed in 1985, we AFFIRM the superior court's grant of summary judgment to DNR.